**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CATHERINE CATON and MARK MCGRAW, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY and METLIFE SERVICES AND SOLUTIONS, LLC,<br><br>*Defendants.* | Case No. 1:26-cv-8576 |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Catherine Caton and Mark McGraw, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Metropolitan Life Insurance Company ("MetLife") and MetLife Services and Solutions, LLC ("MSS," and together with MetLife, "Defendants") to put an end to their unlawful disclosure of Plaintiffs' and the proposed Class's protected health information. Upon personal knowledge as to Plaintiffs' own conduct, and on information and belief as to all other matters, including based on an investigation by counsel, Plaintiffs complain and allege as follows:

## NATURE OF THE ACTION

1. MetLife provides dental and/or vision insurance to consumers, including Plaintiffs.

2. MetLife encouraged plan members to access and manage their plan benefits, and communicate with MetLife, via an authenticated online portal accessible at identity.metlife.com and a related MetLife mobile application (the "MetLife Portal").

3. MSS is a corporate subsidiary of MetLife that operates the MetLife Portal for

MetLife and its plan members.

4. Unbeknownst to Plaintiffs and Class Members, Defendants embedded hidden tracking technologies into the MetLife Portal—including, for example, tracking technologies created by the third-party marketing companies Meta, Adobe, and Microsoft—that automatically transmit to the third-party technology providers (*e.g.*, Meta, Adobe and Microsoft) confidential details about MetLife plan members and their communications with MetLife.

5. The information transmitted to the third-party technology providers included plan members' personally identifiable information ("PII") and non-public personal health information ("PHI" and with PII, "Private Information"), including communications between the plan member and MetLife that revealed: (a) the plan member's identity; (b) the fact that the individual was a MetLife plan member and what the type of coverage they had; (c) the individual's MetLife member number; (d) the individual's employer; and (e) details about the information the individual requested via the MetLife Portal, including, for example, a description of any in-network medical providers the individual searched for on the MetLife Portal.

6. Plaintiffs and Class Members who visited and used the MetLife Portal understandably thought their trusted insurer would *not* disclose their Private Information, including PHI, to third-party marketing companies. Indeed, the HIPAA Notice of Privacy Practices Defendants made available to plan members describes the limited reasons they may use and disclose PHI (essentially, conducting health care operations, administering benefits, and collecting payments), and specifically says that PHI will *not* be disclosed to third parties for marketing purposes.

7. But operating as designed and as implemented by Defendants, the tracking technologies at issue in this case allowed the Private Information that Plaintiffs and Class Members

provided to Defendants to be unlawfully disclosed to the third-party marketing companies alongside unique and persistent identifiers that identify the plan member in a manner that violates federal and state law.

8. By installing the tracking technologies, Defendants effectively planted a bug on Plaintiffs' and Class Members' devices and compelled them to unknowingly disclose their private communications with Defendants, including sensitive and confidential health-related data, to the third-party tracking technology vendors.

9. This Private Information is, in turn, simultaneously intercepted by the tracking technologies and disclosed to the tracking technology vendors, who pair it with unique identifier(s) connected to the individual plan member and use it to, among other things, create profiles for marketing purposes.

10. Neither Plaintiffs nor any other Class Member was provided, much less signed, a written authorization permitting Defendants to disclose their Private Information to the third-party tracking technology providers.

11. The disclosure of Plaintiffs' and Class Members' Private Information via tracking technologies contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). As part of HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health plans must safeguard and protect Private Information.

12. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendants are ***not*** permitted to use tracking technology tools in a way that exposes plan members' Private Information to any third-party without express and informed consent from each plan member.

13. The Office for Civil Rights at HHS has made clear, in a bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures***.[1]

14. Similarly, the Federal Trade Commission also addressed these privacy concerns:

> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out***.[2]

15. Through the HIPAA Notice of Privacy Practices, Defendants further made express and implied promises to protect Plaintiffs' and Class Members' Private Information and maintain the privacy and confidentiality of communications that plan members exchanged with Defendants.

16. Furthermore, by obtaining, collecting, using and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized disclosure.

17. Defendants breached their obligations in one or more of the following ways: (i) failing to adequately review their marketing programs and web-based technology to ensure the MetLife Portal was safe and secure; (ii) failing to remove or disengage technology that was known

---

[1] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (updated Mar. 18, 2024) ("HHS Privacy Bulletin") (last visited Aug. 31, 2026) (emphasis added).

[2] Elisa Jillson, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases*, FTC Business Blog (July 25, 2023) (emphasis added).

and designed to share plan members' information; (iii) failing to obtain the consent of Plaintiffs and Class Members to disclose their PII and PHI to the third-party tracking technology vendors; (iv) failing to take steps to block the transmission of Plaintiffs' and Class Members' PII and PHI through the tracking technologies; (v) failing to warn Plaintiffs and Class Members; and (vi) otherwise failing to design and monitor the MetLife Portal to maintain the confidentiality and integrity of plan member PII and PHI.

18. Plaintiffs and Class Members have suffered injury as a result of Defendants' conduct; these injuries include: (i) trespass on their devices; (ii) invasion of privacy; (iii) intrusion upon seclusion; (iv) loss of benefit of the bargain, (v) compromise and disclosure of Private Information and identities, (vi) violations of statutory rights and related statutory damages, and (vii) the continued and ongoing risk to their Private Information, as the exposed Private Information can—and likely will—be further disseminated to additional third parties utilizing the data for retargeting and marketing.

19. Plaintiffs, on behalf of themselves and all others similarly situated, now assert claims under the federal Electronic Communications Privacy Act ("ECPA"), the California Invasion of Privacy Act ("CIPA"), the California Unfair Competition Law (the "UCL"), the Confidentiality of Medical Information Act ("CMIA"), and state common law, seeking damages and an injunction to stop this unlawful data sharing.

## PARTIES

20. Plaintiff Catherine Caton is a resident of La Mesa, California and a citizen of California. Plaintiff Caton has dental and vision insurance through MetLife.

21. Plaintiff Mark McGraw is a resident of Sacramento, California, and a citizen of California. Plaintiff McGraw had dental insurance through MetLife.

22. MetLife is a company formed under the laws of New York with its headquarters in New York, New York.

23. MSS is a company formed under the laws of Delaware with its headquarters in New York, New York.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises, in part, under the laws of the United States. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are based on a common nucleus of operative facts (i.e., the exact same tracking technologies and disclosures), and form part of the same case or controversy, as Plaintiffs' claim under federal law.

25. Additionally, this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because: (i) there are 100 or more putative class members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiffs and Defendants are citizens of different states.

26. This Court has personal jurisdiction over Defendants because Defendants are headquartered in this District and a substantial portion of the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

27. Venue is proper under 28 U.S.C § 1391(b) because Defendants reside in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### *A. Background on Web Browsers/Applications & Tracking Technologies.*

28. Web browsers and mobile applications are software applications that allow

consumers to exchange electronic communications over the internet.

29. Every website/application is hosted by a computer server through which the entity in charge of the website/application exchanges communications with internet users via their browser/application.

30. Internet users use web browsers and mobile applications to send, receive, and view electronic communications on the internet.

31. The communications between a user and a website begin when the user arrives at the intended website. The communications continue as the user navigates the website. The communications end when the user closes their browser or goes to an unrelated website. Communications restart if a user returns to the website.

32. When an individual uses a web browser to navigate to a website, a number of communications occur between the user's computer and the server that hosts the website. The messages between the user's computer and the server that hosts the website include the following content:

a) *A "GET request" or "POST request" sent from the user's computer to the website server, and a responsive HTTP response sent from the website server to the user's computer.* When an individual internet user visits a web page, his or her web browser sends a message called a "GET request" or a "POST request" to the webpage's server. The requests tell the website what information is being requested and then instruct the website to send the information back to the web browser on the user's computer, which the website does via a responsive HTTP response sent to the user's web browser. The requests and responses include the content the user requested the website to display.

b) *The URL*. The uniform resource locator, or URL, is the location of the requested content on the web server. The URL of a webpage is typically shown in the address bar of the user's browser. URLs often use plain language to describe the associated content (*e.g.*, www.website.com/descriptionofcontent).

c) *The IP address of the user's connection to the internet.* IP stands for "Internet Protocol." When connected to the internet, each device is assigned a unique IP address by the Internet Service Provider ("ISP") that is providing the internet connection. IP addresses may change over time but often do not. In many cases, an ISP will continue to assign the same IP address to the same device.

d) *Information on the User Agent*. A user agent is the hardware and/or software responsible for retrieving the requested content, such as the device, device configurations, operating system and web browser. User agent information is oftentimes unique to the device such that the specific configurations of the accessing device serve as a "fingerprint" to identify and re-identify the same user over time.

e) *A Timestamp*. A timestamp is the time of a request or event that a computer records. The timestamp displays when certain information was requested or exchanged.

33. Mobile applications function similarly. They are hosted by a server (often the same server that hosts the website) and facilitate the exchange of requests and responses with the device communicating with the server. The communications also include an identifier of the requested content (similar to a URL), user IP address, user agent data, and a timestamp.

34. In addition to exchanging the above communications with users' devices, websites

and applications can also cause tracking technologies to be installed on the accessing users' device.

35. In the context of websites, tracking technologies are often referred to as "cookies," "beacons" or "pixels," and, if the website owner has embedded those technologies into the website, they are transmitted by the web server to the accessing users' computer when the user navigates to the web page containing the technology. Once they begin operating on the users' computer, they intercept the portions of the users' communications with the website that the technology is configured to collect and transmit that information to the third-party tracking technology vendor alongside one or more unique identifiers associated with the user.

36. In the context of mobile applications, tracking technologies are often referred to as "software development kits" ("SDK") or "application programming interfaces" ("API"). An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[3] APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[4] "[A]n SDK often contains at least one API."[5] If the application owner has embedded these technologies into an application, they are sent to the user's device with the application software (or update) and thereafter intercept the portions of the users' communications with the server that the technology is configured to collect, and transmit that information to the third-party tracking technology vendor alongside one or more unique identifiers associated with the user.

---

[3] API VS. SDK: THE DIFFERENCE EXPLAINED, https://getstream.io/glossary/api-vs-sdk/.

[4] APPLICATION PROGRAMMING INTERFACE (API), IBM, https://www.ibm.com/cloud/learn/api.

[5] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM, https://www.ibm.com/blog/sdk-vs-api/

37. Tracking technologies work by assigning or associating the user with a unique identifier, storing that identifier with other information about the user, gathering data on the user's online activity in real time, and transmitting that data to the third-party technology vendor. Two of the primary reasons website/application operators use these technologies are to: (1) track user's activity on a website or application; and (2) enable the tracking technology vendor to subsequently serve the individual user with targeted advertising across the internet.

38. Tracking technologies intercept online communications on the user's device—where the tracking technology was sent and operates—at the same time that the communication is occurring with the host server. Thus, tracking technologies intercept the communications on the user's device (*e.g.*, web browser or application) in real time, while the user is actively communicating with the server via their web browser or application.

39. Tracking technologies are configured by the operator of the website/application to collect specific aspects of the communication between the user and server (and not the entire content of *e.g.*, a particular webpage). To achieve this end, tracking technologies read the entire contents of the communication with the host server and collect the parts of the communication that they are configured to collect (*e.g.*, the requests or responses, URL, IP address, user-agent information, etc.). The relevant parts of the communication are then transmitted from the user's device to the tracking technology vendors' servers, where they are stored, analyzed and used for *e.g.*, creating detailed individual profiles to facilitate targeted advertising.

40. The communications transmitted to the third-party tracking technology vendors contain the information described above, including, e.g., the requests and responses, the URL of the requested information (or URL-like location data requested by applications), IP address, and user-agent data. This information is bundled with one or more unique identifiers associated with

the user so that the intercepted communications can be associated with that user on a going-forward basis to *e.g.*, build a targeted marketing profile based on their online activity.

41. Once the third-party tracking technology vendor collects the information contained in the users' communications with the host server, the third-party can store and use the information for its own purposes, including pecuniary purposes and the facilitation of targeted advertising for the third-party's marketing clients.

42. Tracking technologies effectively open a spying window through which the tracking technologies funnel data about users and their communications with the host website/application to third parties in real time from the user's browser or device. It is akin to placing a bug at the point of origin of a call, which causes the communication with the intended recipient, in this case MetLife, to be simultaneously, contemporaneously, live, and in real time transmitted to the tracking technology providers.

43. On a technical level, that is how the tracking technologies on the MetLife Portal operate to intercept Plaintiffs' and the Class's communications with MetLife.

***B. How Defendants Disclose Class Members' Protected Health Information and Enable Intercepting Communications.***

44. MetLife provided and provides dental and/or vision insurance and benefits to consumers, including Plaintiffs.

45. MetLife encouraged plan members to access and manage their plan benefits, and communicate with MetLife, via the online MetLife Portal.

46. MSS is a corporate subsidiary of MetLife that operates the MetLife Portal for MetLife and its plan members.

47. Plan members access the authenticated MetLife Portal by navigating to the associated webpage, or opening the MetLife mobile application, and logging in with their

username and password.

48. Once logged in, plan members can access and manage plan benefits, including reviewing claims and coverage and finding in-network medical providers with particular specialties or characteristics that fit the plan member's medical needs.

49. Unbeknownst to Plaintiffs and other MetLife plan members, Defendants embedded multiple tracking technologies on the MetLife Portal that intercepted plan members' communications with MetLife, which included PHI, and transmitted that information to various third-party tracking technology vendors, including Meta, Adobe, and Microsoft, and others.

50. **Meta**. One of the tracking technologies that Defendants embedded on the authenticated MetLife Portal was created by the third-party advertising company Meta and is referred to as the Meta Tracking Pixel.

a) Meta is an advertising company that sells advertising space by highlighting its ability to target individuals across the internet.[6] Meta can target users so effectively because it surveils user activity both on and off its site.[7] This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[8] Meta compiles this information into datasets called "Core Audiences" or "Custom Audiences," which advertisers use to apply highly specific filters and parameters for their

---

[6] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[7] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[8] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

targeted advertisements.[9]

b) The Meta Tracking Pixel is a piece of code that website/application owners, like Defendants, can integrate into their website/application. Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[10]

c) The Meta Tracking Pixel functions through a series of first- and third-party cookies. The first-party cookies appear to the user's device to be coming from and communicating with the MetLife Portal; the third-party cookies openly communicate with Meta. The first-party cookies essentially circumvent browser-based tracking protections.

d) When a user accesses an online server hosting the Meta Tracking Pixel, the Meta Tracking Pixel is sent to the user's device where it surreptitiously intercepts and reads the user's communications with the server and transmits the portion of those communications the technology was configured to intercept to Meta.

e) The Meta Tracking Pixel is automatically configured to capture certain aspects of the user's communications with the server, including the requests and responses, the location of the information requested and viewed (*e.g.*, URL), "HTTP Headers" (*e.g.*, IP address, information about the web browser, page location, document, referrer and persons using the website), and "Pixel-specific data" (*e.g.*, Pixel ID and cookie). The website host can also configure the

---

[9] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[10] RETARGETING, META, https://www.facebook.com/business/goals/retargeting.

technology to capture additional "event" data that shows *e.g.* which buttons the user clicks on while visiting the webpage or which products the user purchases, and Defendants configured the Meta Tracking Pixel to collect button-click events on the MetLife Portal. All of this information is transferred to Meta in real time as the user is communicating with the server, and Meta thereafter processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

f) To accomplish this, Meta bundles this information with a variety of unique identifiers that it can use to identify the individual communicating with the server for the purposes of associating the data with that individual's Facebook profile to build audiences for Meta's marketing clients.

g) Relevant identifiers include the numerical or alpha-numerical identifiers that travel to Meta via the "c_user," "_fbp," "fr," and "datr" cookies included in the Meta Tracking Pixel. If the individual using the server has a Facebook profile (as most people do), the c_user cookie carries a value called a "Facebook ID." A Facebook ID is a unique and persistent numerical identifier—just like a social security number or driver's license number—that Facebook assigns to each Facebook user and that Facebook can use to identify the specific individual associated with the Facebook ID. In fact, anyone who acquires a Facebook ID can use it to identify the individual associated with it by simply appending the Facebook ID to the end of https://facebook.com/[Facebook ID]. For example, the Facebook ID for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's

Facebook page: www.facebook.com/zuck. The Facebook ID for most Facebook users is a longer numerical string that functions in the same way. Whether or not the individual has a Facebook profile, the fr, _fbp, and datr cookies carry separate unique numerical identifiers assigned to the individual's web browser or device. Although not as direct as the Facebook ID, in practice Meta can use these device identifiers to resolve the individual's identity by comparing the data received to other data already in Meta's possession.

h) Additionally, the Meta Tracking Pixel can be configured to allow for "advanced matching" via a client-side process and also configured to allow for the "Conversions API Gateway" via a server-side process, which associates the data transmitted by the Meta Tracking Pixel with the individual's email address and phone number. Defendants configured the Meta Tracking Pixel to allow advanced matching within the MetLife Portal.

i) When an individual logged onto the MetLife Portal, the Meta Tracking Pixel captured the associated requests and responses and transmitted them to Meta alongside the unique identifiers referenced above, thus disclosing that the individual was a MetLife plan member. After login, the Meta Tracking Pixel captured subsequent communications between the individual and the MetLife Portal that contained, among other things, the type of plan the individual had with MetLife, the group number of the plan and the name of the individual's employer, the individual's initials, the user's IP address and other user-agent information, and buttons the individual clicked on the portal (*e.g.*, to manage claims, apply for a new product, log out, etc.), all of which was bundled with

the unique identifiers described above and transferred to Meta.

51. **Adobe**. Another suite of tracking technologies that Defendants embedded on the MetLife Portal was a set of tracking technologies created by third-party Adobe.

a) Adobe creates software for marketing companies, including its Experience Cloud and Creative Cloud products that seek to have marketers do everything from designing to targeting a marketing campaign on the Adobe platform.

b) Like Meta, Adobe has created a vast system that uses tracking technologies and unique user identifiers to track and profile individuals based on their private web activity across the internet and inside mobile apps.

c) The motive behind Adobe's surveillance network is simple: to amass data that it can use to sell targeted ads.

d) The anchor for Adobe's entire advertising business is its "identity graph"—i.e., the collection of profiles compiled about individuals that aggregate personally identifiable information against unique identifiers that Adobe ties to a specific individual.

e) The touchstone of Adobe's identity graph is a proprietary identifier called the Experience Cloud Identifier or "ECID" (a/k/a "mid" or Marketing Cloud Visitor ID). Adobe creates and assigns an ECID to each individual that comes into contact with its tracking technology. As users visit web properties—whether through a browser or mobile app—Adobe looks up the user to find the corresponding ECID and records their communications with those services to aggregate them back to the same identity profile using the assigned ECID.

f) Adobe's technology is also designed to circumvent browser-based tracking

protections. Many modern browsers, such as Apple's Safari, attempt to prevent online tracking by blocking "third-party cookies." While "cookies" (small text files placed by a web server on a computer or mobile device) are commonly used by website operators, third-party cookies (placed by someone other than the website operator) exist almost exclusively for tracking and marketing. As a workaround, Adobe developed an obscure scheme to conceal the origin of its cookies so they appear to originate from the website operator's first-party code rather than a third party, thereby evading browser privacy controls.

g) Adobe maintains a comprehensive suite of surveillance technologies deployed through its Experience Cloud, which continually feed its advertising systems. These products systematically enhance Adobe's identity graph by intercepting private communications, collecting identifying information, and adding it to user profiles across the internet.

h) To complement its cookies and identifiers, Adobe launched the Adobe Experience Platform Identity Service to maintain tracking continuity when a user logs in across multiple devices (e.g., switching from a mobile phone to a laptop). Through its "Identity Graph Generator," Adobe links disparate identifiers to associate all known activity with the single corresponding individual. Adobe actively markets this solution by emphasizing its ability to identify the "people behind the devices."

i) Defendants embedded numerous tracking technologies offered by Adobe into the MetLife Portal, including Adobe Experience Platform (used for marketing and tracking), Adobe Analytics (used for behavioral measurement), Adobe

Audience Manager (used for advertising and cross-site identification), Adobe Everest (used for advertising and identification sync), and Adobe Target (used for content personalization / targeting).

j) Defendants further configured the MetLife Portal to pass Adobe Identifiers to programmatic ad platforms offered by Yahoo, Xandr, OpenX, Magnite/Rubicon, Magnite/SpotX, Index Exchange, PubMatic, Amazon Advertising, and LiveRamp that allow advertisers to bid on the placement of ads on the users' devices in real time.

k) When an individual logged onto the MetLife Portal, the Adobe tracking technologies captured the associated request and response, and related "event" data, and transmitted that to Adobe alongside the ECID and other unique identifiers used by Adobe (*e.g.*, the unique identifier created by Adobe and carried in the Adobe "demdex" cookie), thus disclosing that the individual was a MetLife plan member. After login, the Adobe tracking technologies captured subsequent communications between the individual and the MetLife Portal that contained, among other things, the individual's MetLife member number (*i.e.*, the unique policy/account number assigned to the individual by MetLife), the type of plan(s) the individual had with MetLife (*e.g.*, "Dental PPO Plan," "Discount Vision," etc.), the group number of the plan and the name of the individual's employer, the user's IP address and other user-agent information, and the full URL of every page requested on the portal, all of which was bundled with the unique identifiers described above and transferred to Adobe.

l) Certain of this information is personally identifying in isolation (*e.g.*, the

MetLife member number), but Adobe can use the ECID and other unique identifiers to perform a user identification sync across other data in its possession to identify or re-identify the user and associate the captured data with the user's marketing profile.

52. **Microsoft.** Another suite of tracking technologies that Defendants embedded on the MetLife Portal was a set of tracking technologies created by third-party Microsoft.

a) Microsoft is a software/hardware and advertising company.

b) Microsoft offers different tracking technologies for websites and mobile applications.

c) On the MetLife Portal mobile application, Defendants embedded a Microsoft technology that transmits the plan members' entire product portfolio (*i.e.*, that the user has a "Dental PPO Plan," "Discount Vision" plan, "Vision Insurance," "Disability" insurance, etc.) to a Microsoft server when the user uses the application. That information is coupled with the user's login email address, employer name in plain text, group number, internal member user ID, and portal login status, and then sent to the Microsoft server.

d) If the user instead accesses the MetLife Portal via the website, Defendants embedded a Microsoft Advertising tracking technology that intercepts the user's communications with the host server. When an individual logged onto the MetLife Portal, the Microsoft tracking technology captured the POST request showing a successful login to the portal, and transmitted that to Microsoft alongside a persistent cross-site identifier associated with the individual called the Microsoft User ID ("MUID"), which Microsoft associates

with the individual's signed-in Microsoft account across its consumer properties, thus disclosing that the individual was a MetLife plan member. After login, the Microsoft tracking technology captured subsequent communications between the individual and the MetLife Portal that contained the user's IP address and other user-agent information, the full URL of every page requested on the portal, as well as the page titles (*e.g.*, "Dashboard," "Account Details," "Claim Summary," "My Profile," etc.), all of which was bundled with the MUID associated with that individual and transferred to Microsoft.

53. **Other Technologies**. Defendants also embedded other tracking technologies offered by various other third-parties into the MetLife Portal, which functioned similarly to the above (*e.g.*, bundling communications captured from the authenticated portal with unique identifiers, IP address, and user-agent information, and transmitting that data to the third-party vendor), including, among others, tracking technologies created by: Google (*i.e.*, the "Google Ads" tracking technology); Reddit (*i.e.*, the "Reddit Ads" tracking technology); and Medallia (*i.e.*, the "Medallia Decibel" and "Medallia / Kampyle" tracking technologies).[11]

54. Collectively, this information reveals to the third-party tracking technology vendors: (a) information sufficient to identify or re-identify the individual user; (b) the user's MetLife member number; (c) that the user is a MetLife plan member; (d) the MetLife insurance plan(s) held by the individual; (e) the user's insurance group and employer; and (f) the types of benefits accessed by the user on the MetLife Portal (*e.g.*, searching for an in-network provider who fit the user's desired criteria and medical needs).

---

[11] The third-party vendors identified in this Complaint whose tracking technologies Defendants embedded on the authenticated MetLife Portal are referred to herein as "Tracking Technology Vendors" and their technologies "Tracking Technologies."

55. For example, when a user logs into the MetLife Portal, the tracking technologies intercept the related GET / POST requests and HTTP responses and transmit portions of those communications reflecting a successful login to the third-party tracking technology vendors. This information reveals that the individual is a MetLife plan member. And many of the tracking technologies are also configured to collect and disclose information describing the type of MetLife coverage the user has (*e.g.*, "Dental PPO," "Discount Vision," etc.) and reference IDs, user number, group number and member number.

56. When a user accesses content within the portal after logging in, the intercepted GET / POST requests and HTTP responses reveal the in-portal page paths and page descriptions visited. And some of the tracking technologies are configured to also intercept in-portal button clicks that reveal what the user was doing in the portal. As just one example, the MetLife Portal allows plan members to search for in-network medical providers that fit their specific medical needs. As the user refines their search parameters by *e.g.*, location of the patient (e.g., zip code or address), the radius of the patient to the provider, language, practice name, and specialty (e.g., oral surgeon), that information is included in the requested page path. In addition, if the user clicks on the provider, the provider's name is shared with Adobe. The tracking technology vendors intercept those communications and thus obtain the details of the user's search for care. This information reveals the types of medical services the plan member is requesting on the MetLife portal.

57. All of this information: (a) allows users to be assembled into profiles and audience segments (*e.g.*, individuals with dental or vision insurance, individuals that are searching for dentists in a particular location, or individuals interested in products like those offered by MetLife) usable for cross-sell and targeted marketing across other sites and applications; and (b) can be aggregated into individual profiles that carry independent marketing value.

58. These interceptions and disclosures are not required or necessary for the MetLife Portal to function, and many websites and applications can and do function without use of these technologies.

59. Plaintiffs' and Class Members' identities could be determined based on the MetLife member number, group/policy number, employer name, initials, IP address, and/or the various unique numerical identifiers that were assigned to them or their devices and disclosed to the tracking technology vendors.

60. Through the tracking technologies, Defendants share MetLife plan members' identities and information related to their private medical treatment. This is precisely the type of information that HIPAA requires healthcare providers to anonymize to protect the privacy of plan members.[12]

61. By embedding the tracking technologies on the MetLife Portal, Defendants caused Plaintiffs' and Class Members' communications to be intercepted and transmitted to the tracking technology vendors via the tracking technologies.

62. Defendants' conduct was knowing and intentional. Upon information and belief, the third-party vendors disclosed the tracking technologies functionality to Defendants prior to Defendants' decision to embed the technologies on the MetLife Portal. Indeed, each of the tracking technologies is provided pursuant to an agreement that discusses its functionality. Moreover, MetLife is a large company with a dedicated IT staff that must know what technologies it is putting on the MetLife Portal and how those technologies function.

63. Class Members, including Plaintiffs, did not consent to or authorize these

---

[12] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Aug. 21, 2026).

interceptions and disclosures. Indeed, all of these transmissions are hidden from the plan member, and the plan member only sees the rendered page or portion of the MetLife Portal, without an obvious indication of third-party interception or disclosure.

64. By law, Plaintiffs and Class Members are entitled to privacy in their protected health information and confidential communications. Defendants deprived Plaintiffs and Class Members of their privacy rights when they: (i) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential communications, personally identifiable information, and protected health information to a third party; (ii) disclosed plan members' protected information to the tracking technology vendors – unauthorized third-party eavesdroppers; and (iii) undertook this pattern of conduct without notifying Plaintiffs and Class Members and without obtaining their express written consent.

65. Because the tracking technologies are surreptitiously installed on users' devices without consent, and operate in the code running in the background on users' devices, Plaintiffs did not discover that Defendants disclosed their personally identifiable information and protected health information to the tracking technology vendors, and assisted those third-parties with intercepting their communications with Defendants, until shortly before the Complaint was filed.

***C. Defendants Violated HIPAA And Duties Owed Thereunder.***

66. Plan member health care information in the United States is protected by federal law under HIPAA and its implementing regulations, which are promulgated by HHS.

67. The HIPAA Privacy Rule, located at 45 C.F.R. Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct

certain health care transactions electronically."[13]

68. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

69. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

70. Under the HIPAA de-identification rule, "health information is not individually identifiable health information only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"; or (2)(i) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

A. Names;
***
H. Medical record numbers;
I. Health plan beneficiary numbers;
J. Account numbers;

[13] HHS.gov, Health Information Privacy (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

> ***
> M. Device identifiers and serial numbers;
> N. Web Universal Resource Locators (URLs);
> O. Internet Protocol (IP) address numbers; … and
> R. Any other unique identifying number, characteristic, or code…; and
>
> (ii) the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514(b).

71. In an HHS Health Information Privacy Bulletin ("HHS Privacy Bulletin"), HHS confirmed that HIPAA's protections apply to regulated entities' use of tracking technologies on webpages, such as Defendants' use of the Tracking Technologies on the MetLife Portal and related subpages.[14] Specifically, HHS explained that "Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage."[15]

72. The HIPAA Privacy Rule requires any "covered entity"—which includes health plans like MetLife's dental and vision plans—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

73. Whenever a third-party creates, receives, maintains, or transmits PHI on behalf of a covered entity to perform a function or service, the third-party and covered entity must have a

[14] *See* HHS Privacy Bulletin.
[15] *Id.*

HIPAA-compliant Business Associate Agreement. 45 C.F.R. §§ 164.502, 164.504.

74. An individual or corporation violates HIPAA if it knowingly and in violation of 42 U.S.C. §§ 1320d—1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; (2) obtains individually identifiable health information relating to an individual; or (3) discloses individually identifiable health information to another person." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320d-6(b)(3).

***i. Plan member status is among the health information protected by HIPAA***

75. An individual's status as a plan member is protected by HIPAA.

76. In *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule*, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care

provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[16]

77. In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients or enrollees to third parties* without obtaining authorization from each person on the list. (Emphasis added).[17]

78. The instructions continue:

> For example, it is "marketing" when: . . . A health plan sells a list of its members to a company that sells blood glucose monitors, which intends to send the plan's members brochures on the benefits of purchasing and using the monitors.

79. HHS has instructed for decades that patient status – identical to plan member status – is protected by the HIPAA Privacy Rule:

a) "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b) "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere status with the covered entity, 67 Fed. Reg. 53186 (Aug. 14, 2002), such as a patient or plan member list;

c) It would be a HIPAA violation "if a covered entity impermissibly disclosed a

---

[16] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Aug. 21, 2026).

[17] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Aug. 21, 2026).

list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

***ii. The Use Of PHI For Marketing, Including On The Internet, Is Prohibited Absent Informed Consent.***

80. Pursuant to 45 C.F.R. § 164.508(a)(3), "a covered entity ***must*** obtain an authorization for any use or disclosure of protected health information for marketing" other than face-to-face communications between the covered entity and individual or promotional gifts of nominal value.

81. HHS issued a bulletin in December 2022 (the "Bulletin") "to highlight the obligations" of covered entities, such as health plans, and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[18]

82. In the Bulletin, HHS reminded covered entities that HIPAA applies to covered entities', including health plans', use of tracking technologies like the tracking technologies at issue here. Among other things, HHS explained that covered entities, such as health plans, violate HIPAA when they use tracking technologies that disclose an individual's identifying information (like an IP address) even if no treatment information is included and even if the individual does not have a relationship with the covered entity:

> *How do the HIPAA Rules apply to regulated entities' use of tracking technologies?*
>
> Some regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's

[18] HHS.gov, *HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information*, https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

> website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps. The information disclosed might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code. In some cases, the information disclosed may meet the definition of individually identifiable health information (IIHI), which is a necessary pre-condition for information to meet the definition of PHI when it is transmitted or maintained by a regulated entity.
>
> IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. But the mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care.[19]

83. Tracking technology vendors like those at issue here are considered business associates under HIPAA if they provide services to the health plan and receive or maintain PHI:

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (e.g. health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[20]

84. HHS explained that tracking technologies on covered entities' patient portals "generally have access to PHI" and may access diagnosis and treatment information, in addition

---

[19] *See* HHS Privacy Bulletin.

[20] *Id.*

to other sensitive data:

> Tracking on user-authenticated webpages
>
> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. ***Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI***. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. ***Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal***. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[21]

85. The Privacy Rule does not permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures. Regulated entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.

### ***iii. Internet Cookies Are Personally Identifiable***

86. In the early years of the internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

87. Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's web browser and computing device when that person's web

[21] *See* HHS Privacy Bulletin (emphases added.)

browser interacts with the website server. Cookies can perform different functions, like saving a user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual internet user's communications and activities on websites across the internet.

88. Cookies are designed to and, in fact, most often do operate as a means of identification for internet users.

89. Cookies are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

90. Defendants improperly disclosed cookies along with Private Information, including cookies that contained the user's MetLife member number and various other unique numerical identifiers.

***iv. IP Addresses are Personally Identifiable Information.***

91. In addition to plan member status, URLs and other page paths related to the user's use of the portal (*e.g.*, management of claims and coverage, efforts to find an in-network provider fitting the user's medical needs, etc.), and other identifiers, Defendants improperly disclosed plan members' computer IP addresses to the tracking technology vendors.

92. An IP address is a number that identifies the address of a device connected to the internet.

93. IP addresses are used to identify and route communications on the internet.

94. IP addresses of individual internet users are used by internet service providers, websites, applications and third-party tracking companies to facilitate and track internet communications.

95. Under HIPAA, an IP address is considered personally identifiable information:

a. HIPAA's de-identification standard treats as identifiers "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514(b)(2)(i)(O), (R).

b. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(b)(2)(ii).

96. Even though an IP address could be connected to several members of the same household, it is still considered PHI. That is true, *even when the individual does not have an existing relationship with the regulated healthcare entity* since when the covered entity collects this information through its website or mobile app, it is indicative that the individual has received or will receive health care services or benefits from the covered entity.[22]

97. Consequently, Defendants' disclosure of plan members' IP addresses violated HIPAA and industry privacy standards.

***D. Defendants' HIPAA Notice Of Privacy Practices & Promises***

98. Defendants publish a HIPAA Notice of Privacy Practices ("HIPAA Notice") that informs actual or prospective plan members of how MetLife treats their PHI.

99. Defendants' HIPAA Notice states: "This notice describes how information about you, including Protected Health Information under HIPAA and/or medical records protected by federal confidentiality rules (42 C.F.R. Part 2), may be used and disclosed."

100. Defendants' HIPAA Notice states: "MetLife strongly believes in protecting the confidentiality and security of information we collect about you."

[22] *See* HHS Privacy Bulletin.

101. Defendants' HIPPA Notice contains a list of permissible PHI disclosures, which reads, in its entirety, as follows:

c. "As allowed by law, we may use and disclose PHI to: make, receive or collect payments; conduct health care operations; administer benefits by sharing PHI with affiliates and Business Associates; assist plan sponsors in administering their plans; and inform persons who may be involved in or paying for another's health care."

d. "In addition, we may use or disclose PHI: where required by law or for public health activities; to avert a serious threat to health or safety; for health-related benefits or services; for law enforcement or specific government functions; when requested as part of a regulatory or legal proceeding; and to provide information about deceased persons to coroners, medical examiners, or funeral directors."

102. Defendants' HIPAA Notice states: "Other uses and disclosures of PHI not covered by this notice and permitted by the laws that apply to us will be made only with your written authorization or that of your legal representative."

103. Defendants' HIPAA Notice of Privacy Practices does ***not*** permit Defendants to use and disclose Plaintiffs' and Class Members' Private Information for marketing purposes absent the informed written consent of each affected plan member.

104. Defendants' HIPAA Notice states: "We protect your PHI from inappropriate use or disclosure," and, further, that even MetLife employees "may look at your PHI only when there is an appropriate reason to do so, such as to administer our products or services."

105. Defendants' HIPAA Notice states: "We will not sell or disclose you PHI to any other company for their use in marketing their products to you."

106. Defendants' marketing and assurances that they will keep plan members' Private

Information confidential and secure are false.

107. Defendants violated their own HIPAA Notice by unlawfully facilitating the interception and disclosure of Plaintiffs' and Class Members' Private Information to the tracking technology vendors without acquiring the specific plan members' written consent or authorization.

***E. Plaintiffs' & Class Members' Expectation of Privacy***

108. At all times when Plaintiffs and Class Members provided their PII and PHI to Defendants, they each had a reasonable expectation that the information would remain private, and that Defendants would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

109. Plan members are aware of their health plan's duty of confidentiality, and, as a result, have an objectively reasonable expectation that their health plans will not share their personally identifiable data and communications with third parties in the absence of authorization for any purpose that is not directly related or beneficial to the plan member's care.

110. Defendants' surreptitious disclosure of Plaintiffs' and Class Members' private communications, including PII, health information, and other sensitive data, violates Plaintiffs' and Class Members' expectation of privacy.

***F. Plaintiffs' and Class Members' Private Information has economic value.***

111. Defendants and the Tracking Technology Vendors that Defendants use profit from their use of Plaintiffs' and Class members' personal data to target them with advertising and for other economic benefits, such as improving their online platforms and advertising efficiency.

112. The value of personal data is well understood and generally accepted as a form of currency. The robust market for Internet user data has been analogized to the "oil" of the tech

industry.[23] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[24] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

113. The Organisation for Economic Co-operation and Development ("OECD") has published numerous volumes discussing how to value data such as that which is the subject matter of this Complaint, including as early as 2013, with its publication "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[25] The OECD recognizes that data is a key competitive input not only in the digital economy but in all markets: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[26]

114. In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshana Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee for services provided to customers to monetizing users' data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[27] In essence, Professor Zuboff explains that revenue from Internet user data pervades every economic transaction in the modern economy. It is a fundamental assumption of

---

[23] https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data

[24] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[25] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecd.org/en/publications/exploring-the-economics-of-personal-data_5k486qtxldmq-en.html.

[26] https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en

[27] Shoshana Zuboff, THE AGE OF SURVEILLANCE CAPITALISM 166 (2019).

these revenues that there is a market for this data.

115. Professor Paul M. Schwartz noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[28]

116. Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and former principal technologist at the ACLU) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[29]

117. As Professors Acquisti, Taylor, and Wagman relayed in their 2016 article "The Economics of Privacy," published in the *Journal of Economic Literature*: "Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as business assets that can be used to target services or offers, provide

---

[28] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

[29] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

relevant advertising, or be traded with other parties."[30]

118. The cash value of the personal user information unlawfully collected by Defendants can be quantified. For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[31] Web browsing histories were valued at $52.00 per year.




119. Similarly, the value of user-correlated internet browsing history can be quantified because Google Inc. was willing to pay users for similar information. Google had a panel called "Google Screenwise Trends" which, according to the internet giant, was designed "to learn more about how everyday people use the Internet." Upon becoming a panelist, internet users would add a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of

---

[30] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. Econ. Literature 442, 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf

[31] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039syour-personal-data-worth.html.

a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated that internet industry participants understood the enormous value in internet users' browsing habits. Google pays Screenwise panelists up to $5 per week to be tracked.

120. User-correlated URLs have monetary value. They also have non-monetary, privacy value. For example, in a study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-eight percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.

121. Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies . . . control too much of our personal information and know too much about our browsing habits."

122. A number of platforms have appeared where consumers can and do directly monetize their own data, and prevent tech companies from targeting them absent their express consent:

a) Brave's web browser, for example, will pay users to watch online targeted ads,

while blocking out everything else.[32]

b) Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin.[33]

c) Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[34]

d) Killi is a new data exchange platform that allows you to own and earn from your data.[35]

e) Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[36]

f) The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers and mobile devices through Nielsen

---

[32] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disabled by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

[33] https://loginhood.io/. *See also* https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[34] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[35] https://killi.io/earn/.

[36] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

Computer and Mobile Panel. By installing the application on your computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and earn points worth up to $50 per month.[37]

123. Technology companies recognize the monetary value of users' sensitive, personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[38]

124. In a 2015 study by the Ponemon Institute, researchers determined the value that American Internet users place on their "health condition" was more valuable than any other piece of data about them, with a minimum value of $59.80.[39]

125. Medical information derived from medical providers garners even more value from the fact that it is not available to third party data marketing companies because of strict restrictions on provider disclosures under HIPAA, state laws, and health plan standards.

126. Even with restrictions on the disclosure of personally identifiable health information, a robust market exists for the trade of de-identified health data.[40]

---

[37] Kevin Mercadante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[38] Kari Paul, *Facebook launches app that will pay users for their dat*a, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study; Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app.

[39] *See* Ponemon Institute, Privacy and Security in a Connected Life: A Study of US Consumers, March 2015, available at https://vdocuments.site/privacy-and-security-in-a-connected-life-protect-personal-information-from-being.html?page=1.

[40] *See* Adam Tanner, *How Data Brokers Make Money Off Your Medical Records*, Scientific American, https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/ (February 1, 2016); Sam Thielman, *Your Private Medical Data is for Sale – and It's Driving a Business Worth Billions,* The Guardian,

127. Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things like data and communications. Plaintiffs and Class Members have a vested property right in their individually identifiable health information.

128. The United States Supreme Court has explained that, "Confidential business information has long been recognized as property." *Carpenter v. United States*, 484 U.S. 19, 26 (1987). "Depriv[ation] of [the] right to exclusive use of … information" causes a loss of property "for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id*. at 27. There is no doubt that Defendants have a "property right" in plan member data such that, if Meta or Adobe took such information from Defendants without authorization, Defendants would have a claim for the taking of their property. Plan members also have a property right in their own health information that may not be taken or used by Defendants without their authorization for non-health care related reasons.

129. Federal and state law grant plan members the right to protect the confidentiality of data that identifies them as plan members of a particular health plan and restrict the use of their health data, including their status as a plan member, to only uses related to their care or otherwise authorized by federal or state law in the absence of plan member authorization.

130. A plan member's right to protect the confidentiality of their health data and restrict access to it is a valuable right.

131. In addition to property rights in their health data, plan members enjoy property rights in the privacy of their health communications.

---

https://www.theguardian.com/technology/2017/jan/10/medical-data-multibillion-dollar-business-report-warns (January 10, 2017); Adam Tanner, *The Hidden Global Trade in Patient Medical Data*, YaleGlobal Online, https://archive-yaleglobal.yale.edu/content/hidden-global-trade-patient-medical-data (last visited Sept. 1, 2026).

132. Plan member property rights in their health data and communications are established by HIPAA and state health privacy laws that are equally or more stringent than HIPAA.

133. American courts have long recognized common law property rights in the content of a person's communications that are not to be used or disclosed to others without authorization.

134. Property rights in communications and information privacy are established by:

a. The Electronic Communications Privacy Act, including Title I (the Wiretap Act); Title II (the Stored Communications Act); and Title III (the Pen Register Act);

b. State laws that establish a right to keep communications confidential; and

c. Common law information property rights regarding the exclusive use of confidential information that have existed for centuries and continue to exist. *See Folsom v. Marsh*, 9 F. Cas. 342, 346 (C.C.D. Mass. 1841) (Story, J.); *Baker v. Libbie*, 210 Mass. 599, 602 (1912); *Denis v. LeClerc*, 1 Mart. (La.) 297 (1811).

135. Defendants' unauthorized acquisition, use, and disclosure of Plaintiffs' and Class Members' individually identifiable health information for marketing purposes violated their property rights to control how their health data and communications are used and who may be the beneficiaries of their data and communications.

136. Plaintiffs and Class Members seek to recover the value of the unauthorized access to their Private Information resulting from Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to

practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiffs and class members have a protectible property interest in their Private Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

137. MetLife does not provide its services for free. All MetLife plan members, including Plaintiffs, pay MetLife premiums either directly or indirectly. When MetLife purports to provide their plan members with a modern, convenient and secure means of obtaining their services, including managing plan benefits online and accessing its in-network provider list, that is an integral part of the services that Defendants provide that has real value. When MetLife failed to follow through in providing the promised level of privacy and security, MetLife plan members (including Plaintiffs) did not receive the full benefit of the bargain that they struck with MetLife when they paid for their services. Indeed, the bargain included health insurance at the cost of the premiums *without* the additional consideration of providing plan member PHI to third-parties to enhance Defendants' marketing or other services.

138. In the modern economy, consumers pay for services with more than money.

139. On the Internet, consumers often pay for services by granting the company with which they are engaged a license to collect and use their personal data for marketing purposes.

140. Although increasing in prevalence due to the Internet, there is nothing novel about such arrangements. Bartering occurred prior to the invention of currency. The exchange of a data license for use of a service is a modern-day bartering arrangement.

141. Thus, although certain services do not involve the payment of money, they are not free. Consumers pay for the services by giving a license to use their data instead.

142. The right to collect and use consumer data is valuable and monetizable—by companies and consumers. This is particularly true of health information.

143. On the surface, the price of MetLife's health care services includes the payments that users made to MetLife. But what Defendants failed to disclose to plan members is that they were also granting themselves a license to collect, disclose to third-parties, and use their health information for MetLife's own benefit, including for marketing purposes.

144. In signing up to become a MetLife plan member, Plaintiffs and Class Members granted MetLife a license to use their information and communications that was limited to the purposes listed in the HIPAA Notice. As described herein, that disclosure does not extend to the disclosure of their protected health information for marketing purposes or for reasons unrelated to health care and the administration of plan benefits. Thus, the limits of the data license that MetLife obtains in order to provide services to plan members is prescribed by the HIPAA Notice and did not include using, disclosing, or selling plan member information for marketing purposes.

145. MetLife overcharged plan members by granting itself a license to use and disclose valuable plan member health data beyond the license and limitations specifically stated in the HIPAA Notice.

146. The "data license" overcharge that MetLife collects, uses, and shares for marketing purposes without authorization has monetary value. For example, a 2015 study found respondents

placed a value of $59.80 on health information.

147. In addition, some companies sell de-identified health information in the open market. For example, a company named Prognos Health provides a data platform where it purports to sell information from "more than 325 million de-identified patients."

148. Because Americans typically do not want to sell their personal health information for any purpose and it is illegal to even share such information without express, written authorization, there are fewer open markets for a license to collect or sell personal health information for non-health purposes than other types of data. However, black markets do exist for such data. It has been reported that health data can be "more expensive than stolen credit card numbers" on black markets.

## REPRESENTATIVE PLAINTIFFS' EXPERIENCES

***Catherine Caton***

149. Plaintiff Catherine Caton receives MetLife insurance through her employer, including dental, vision, long- and short-term disability, and other coverages.

150. Plaintiff has had MetLife dental and vision insurance since January 2024 and has it presently.

151. On multiple occasions during the time period she has had MetLife dental and vision insurance, Plaintiff logged into the MetLife Portal from her browser on her computer and through the mobile application on her phone and was authenticated as a plan member and thereafter used the MetLife Portal to access and manage plan benefits, including to search for in-network providers that met her medical needs.

152. During the relevant time period, Plaintiff also had a Facebook account.

153. Each time that Plaintiff used the MetLife Portal, her communications with MetLife

were intercepted by the tracking technologies thereon and disclosed to the tracking technology vendors, as described in Paragraphs 44-65 of this Complaint.

154. The intercepted communications revealed, among other things: (a) Plaintiff's status as a MetLife plan member; (b) her MetLife member number; (c) the MetLife policies she held; (d) her group number and employer name; (e) the actions she took on the MetLife Portal, including the details of the in-network providers she searched for on the portal; (f) her IP address and other user-agent information; (g) the frequency and timing of her access to her authenticated account. This information was bundled with the unique identifiers described throughout this complaint and transferred to the third-party technology vendors.

155. This information was protected under HIPAA, including because it revealed, among other things, Plaintiff's status as a MetLife plan member, her MetLife member number, and details regarding the medical treatment she was seeking.

156. Plaintiff reasonably expected that her communications with MetLife via the MetLife Portal were confidential, solely between herself and Defendants, and that such communications would not be transmitted to or intercepted by a third party for marketing (or any other) purpose.

157. Plaintiff provided her Private Information to Defendants and trusted that the information would be safeguarded according to Defendants' policies and state and federal law.

158. As described herein, Defendants worked along with the Tracking Technology Vendors to intercept Plaintiff's communications, including those that contained private information.

159. Defendants willfully facilitated these interceptions without Plaintiff's knowledge, consent or express written authorization.

160. Plaintiff did not consent or otherwise provide express written authorization to Defendants to transmit her Private Information to the Tracking Technology Vendors.

161. By doing so without her consent, Defendants breached Plaintiff's right to privacy and unlawfully disclosed Plaintiff's Private Information.

162. Plaintiff suffered injuries and damages in, *inter alia*, the form of (i) trespass on her devices; (ii) invasion of privacy; (iii) intrusion upon her seclusion; (iv) violation of confidentiality of her Private Information; (v) loss of benefit of the bargain; (vi) violation of her legal rights and statutory damages; and (vii) the continued and ongoing risk to her Private Information.

163. Plaintiff has a continuing interest in ensuring that her Private Information is protected and safeguarded from future unauthorized disclosure. Plaintiff anticipates needing to use the MetLife Portal to manage her plan benefits in the future.

***Mark McGraw***

164. Plaintiff Mark McGraw received MetLife dental insurance through his employer.

165. Plaintiff had MetLife dental insurance through 2024.

166. On multiple occasions during the time period he had MetLife dental insurance, Plaintiff logged into the MetLife Portal from his browser on his computer and through the mobile application on his phone and was authenticated as a plan member and thereafter used the MetLife Portal to access and manage plan benefits, including to search for in-network providers that met his medical needs.

167. During the relevant time period, Plaintiff also had a Facebook account.

168. Each time that Plaintiff used the MetLife Portal, his communications with MetLife were intercepted by the tracking technologies thereon and disclosed to the tracking technology vendors, as described in Paragraphs 44-65 of this Complaint.

169. The intercepted communications revealed, among other things: (a) Plaintiff's status as a MetLife plan member; (b) his MetLife member number; (c) the MetLife policies he held; (d) his group number and employer name; (e) the actions he took on the MetLife Portal, including the details of the in-network providers she searched for on the portal; (f) his IP address and other user-agent information; (g) the frequency and timing of his access to his authenticated account. This information was bundled with the unique identifiers described throughout this complaint and transferred to the third party technology vendors.

170. This information was protected under HIPAA, including because it revealed, among other things, Plaintiff's status as a MetLife plan member, his MetLife member number, and details regarding the medical treatment he was seeking.

171. Plaintiff reasonably expected that his communications with MetLife via the MetLife Portal were confidential, solely between himself and Defendants, and that such communications would not be transmitted to or intercepted by a third party for marketing (or any other) purpose.

172. Plaintiff provided his Private Information to Defendants and trusted that the information would be safeguarded according to Defendants' policies and state and federal law.

173. As described herein, Defendants worked along with the Tracking Technology Vendors to intercept Plaintiff's communications, including those that contained private information.

174. Defendants willfully facilitated these interceptions without Plaintiff's knowledge, consent or express written authorization.

175. Plaintiff did not consent or otherwise provide express written authorization to Defendants to transmit his Private Information to the Tracking Technology Vendors.

176. By doing so without his consent, Defendants breached Plaintiff's right to privacy and unlawfully disclosed Plaintiff's Private Information.

177. Plaintiff suffered injuries and damages in, *inter alia*, the form of (i) trespass on his devices; (ii) invasion of privacy; (iii) intrusion upon his seclusion; (iv) violation of confidentiality of his Private Information; (v) loss of benefit of the bargain; (vi) violation of his legal rights and statutory damages; and (vii) the continued and ongoing risk to his Private Information.

178. Plaintiff has a continuing interest in ensuring that his Private Information is protected and safeguarded from future unauthorized disclosure.

**DELAYED DISCOVERY & TOLLING**

179. Each unauthorized collection of private, personal data by Defendants are a separate "wrong" which triggers anew the relevant statute of limitations.

180. Further, all applicable statutes of limitation have been tolled by operation of the delayed discovery doctrine, which delays accrual until Plaintiffs had sufficient notice of the cause of action.

181. The tracking technologies operated surreptitiously as part of the code running in the background on Plaintiffs' devices.

182. Plaintiffs did not discover, and had no reason to know, that their communications with the MetLife Portal were being intercepted in the manner described herein until shortly before the Complaint was filed.

183. Plaintiffs did not discover and could not reasonably have discovered that Defendants were collecting, storing, and using their personal, private data in the ways set forth in this Complaint until they consulted with counsel—shortly before the Complaint was filed.

## CLASS ACTION ALLEGATIONS

184. Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

185. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> **All MetLife dental and vision insurance plan members residing in the United States whose Private Information was disclosed to a third party through tracking technologies on the MetLife Portal.**

186. The California Class that Plaintiffs seek to represent is defined as follows:

> **All MetLife dental and vision insurance plan members residing in California whose Private Information was disclosed to a third party through tracking technologies on the MetLife Portal.**

187. Excluded from the Classes are Defendants, its agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any of Defendants' officers or directors, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

188. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

189. Numerosity, Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are over a million individuals whose PII and PHI may have been improperly accessed by the Tracking Technology Vendors, and the Classes are identifiable within Defendants' records.

190. Commonality & Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Nationwide and California Classes exist and predominate over any questions affecting only individual Class Members. These include:

a) Whether and to what extent Defendants had a duty to protect the PII and PHI of Plaintiffs and Class Members;

b) Whether Defendants had duties not to disclose the PII and PHI of Plaintiffs and Class Members to unauthorized third parties;

c) Whether Defendants violated their HIPAA Notice of Privacy Practices by disclosing the PII and PHI of Plaintiffs and Class Members to the Tracking Technology Vendors and/or additional third parties.

d) Whether Defendants adequately, promptly and accurately informed Plaintiffs and Class Members that their PII and PHI would be disclosed to third parties;

e) Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their PII and PHI had been compromised;

f) Whether Defendants adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

g) Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiffs and Class Members;

h) Whether Defendants violated the statutes invoked herein;

i) Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

j) Whether Defendants knowingly made false representations in their HIPAA Notice of Privacy Practices;

k) Whether Defendants knowingly omitted material representations with respect to their HIPAA Notice of Privacy Practices; and

l) Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' disclosure of their PII and PHI.

191. Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendants' use of the Tracking Technologies, due to Defendants' misfeasance.

192. Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Classes. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Classes and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

193. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a defendant, like Defendants, with significant resources. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the

courts.

194. Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

195. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

196. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

197. Ascertainability & Notice. Membership in the Classes can be determined by

objective records maintained by Defendants and adequate notice can be given to Class Members directly using information maintained in Defendants' records.

198. Class-wide Injunctive Relief, Fed. R. Civ. P. 23(b)(2). Unless a Class-wide injunction is issued, Defendants will continue in their failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendants may continue to act unlawfully as set forth in this Complaint as Defendants have acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

199. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendants owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;

b) Whether Defendants owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information with respect to Defendants' HIPAA Notice of Privacy Practices;

c) Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d) Whether Defendants failed to comply with their own policies and applicable

laws, regulations, and industry standards relating to data security;

e) Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

f) Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

g) Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

**CLAIMS**

**COUNT I**

**BREACH OF CONFIDENCE**

**(On behalf of Plaintiffs & the Nationwide Class)**

200. Plaintiffs and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

201. Health plans have a duty to their plan members to keep non-public medical information confidential.

202. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendants, including communications exchanged on the MetLife Portal, which were further buttressed by Defendants' express promises in their HIPAA Notice of Privacy Practices.

203. Contrary to its duties as a health plan and its express promises of confidentiality,

Defendants caused the Tracking Technologies to be surreptitiously installed on plan member's devices and to disclose and to transmit to third parties Plaintiffs' and Class Members' communications with Defendants including Private Information and the contents of such information.

204. These disclosures were made without Plaintiffs' or other Class Members' knowledge, consent or authorization.

205. The third-party recipients included, but were not limited to, the Tracking Technology Vendors.

206. The harm arising from a breach of health plan-plan member confidentiality includes erosion of the essential confidential relationship between the health plan and the patient.

207. As a direct and proximate cause of Defendants' unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendants' breach in that:

a. Defendants, via the Tracking Technologies, trespassed on Plaintiffs' and Class Members' devices;

b. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

c. Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

d. Defendants eroded the essential confidential nature of the health plan-plan member relationship;

e. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

f. Plaintiffs and Class Members did not get the full value of the health plan services for which they paid, which included Defendants' duty to maintain confidentiality;

g. Defendants' actions diminished the value of Plaintiffs' and Class Members' Private Information; and

h. Defendants' actions violated the property rights Plaintiffs and Class Members have in their Private Information.

**COUNT II**

**BREACH OF CONTRACT**

**(On behalf of Plaintiff & the Nationwide Class)**

208. Plaintiffs and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

209. MetLife required Plaintiffs and Class Members to provide their Private Information, including names, location information, computer IP addresses, and other content submitted into the MetLife Portal as a condition of their receiving health plan services.

210. As a condition of utilizing MetLife's digital platforms and receiving services from MetLife, Plaintiffs and Class Members provided their Private Information and compensation for their health plan services.

211. In so doing, Plaintiffs and Class Members entered into agreements with MetLife under which MetLife agreed to safeguard and protect such information, including in its HIPAA

Notice of Privacy Practices.

212. MetLife's relevant HIPAA Notice of Privacy Practices and representations require it to take appropriate steps to safeguard the Private Information entrusted to it by the Plaintiff and Class Members.

213. In particular, Defendants' HIPAA Notice states: "This notice describes how information about you, including Protected Health Information under HIPAA and/or medical records protected by federal confidentiality rules (42 C.F.R. Part 2), may be used and disclosed."

214. Defendants' HIPAA Notice states: "MetLife strongly believes in protecting the confidentiality and security of information we collect about you."

215. Defendants' HIPPA Notice contains a list of permissible PHI disclosures, which reads, in its entirety, as follows:

e. "As allowed by law, we may use and disclose PHI to: make, receive or collect payments; conduct health care operations; administer benefits by sharing PHI with affiliates and Business Associates; assist plan sponsors in administering their plans; and inform persons who may be involved in or paying for another's health care."

f. "In addition, we may use or disclose PHI: where required by law or for public health activities; to avert a serious threat to health or safety; for health-related benefits or services; for law enforcement or specific government functions; when requested as part of a regulatory or legal proceeding; and to provide information about deceased persons to coroners, medical examiners, or funeral directors."

216. Defendants' HIPAA Notice states: "Other uses and disclosures of PHI not covered by this notice and permitted by the laws that apply to us will be made only with your written authorization or that of your legal representative."

217. Defendants' HIPAA Notice of Privacy Practices does ***not*** permit Defendants to use and disclose Plaintiffs' and Class Members' Private Information for marketing purposes absent the informed written consent of each affected plan member.

218. Defendants' HIPAA Notice states: "We protect your PHI from inappropriate use or disclosure," and, further, that even MetLife employees "may look at your PHI only when there is an appropriate reason to do so, such as to administer our products or services."

219. Defendants' HIPAA Notice states: "We will not sell or disclose you PHI to any other company for their use in marketing their products to you."

220. Plaintiffs and Class Members fully performed their obligations under their agreement with MetLife.

221. MetLife breached the agreement by disclosing plan member PHI to the third-party tracking technology vendors.

222. MetLife breached the agreement by failing to obtain proper authorization for the use or disclosure of PHI for marketing.

223. As a direct and proximate result of MetLife's above-described breach of contract, Plaintiffs and Class Members have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities.

224. As a direct and proximate result of MetLife's above-described breach of contract, Plaintiffs and Class Members are entitled to recover actual, consequential, and/or nominal damages.

**COUNT III**

**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**

**18 U.S.C. § 2511(1) *et seq*.**

**UNAUTHORIZED INTERCEPTION, USE AND DISCLOSURE**

**(On Behalf of Plaintiffs & the Nationwide Class)**

225. Plaintiffs and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

226. The ECPA protects both sending and receipt of communications.

227. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

228. Electronic Communications. The electronic communications between Plaintiffs and Class Members and Defendants, via the MetLife Portal, are each an "electronic communication" under the ECPA's definition of 18 U.S.C. § 2510(12). The transmission of PII and PHI between Plaintiffs and Class Members and Defendants' MetLife Portal with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

229. Content. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

230. Intercept. The ECPA defines interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

231. Electronic, Mechanical, or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a) Plaintiffs' and Class Members' browsers;

b) Plaintiffs' and Class Members' computing devices (including mobile devices);

c) Defendants' web-servers;

d) Defendants' MetLife Portal; and

e) The tracking technologies deployed by Defendants to effectuate the sending and acquisition of patient communications.

232. By utilizing and embedding the Tracking Technologies on the MetLife Portal, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

233. Specifically, Defendants intercepted Plaintiffs' and Class Members' electronic communications via the Tracking Technologies, which tracked, intercepted, disclosed, and stored, the contents of Plaintiffs' and Class Members' communications with MetLife to the Tracking Technology Vendors.

234. Defendants' intercepted communications include, but are not limited to, communications to/from Plaintiffs' and Class Members' containing PII and PHI, such as unique numerical identifiers, plan member number and status, plan type, group number and employer, requests made on the MetLife portal, and information related to medical specialists searched for

on the portal.

235. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

236. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

237. Unauthorized Purpose. Defendants' conduct was not authorized by Plaintiffs' and Class Members. Defendants conduct constituted a crime or tort, including violation of HIPAA, violation of the other laws identified herein, trespass, invasion of privacy, and intrusion upon seclusion.

238. Defendants intentionally used the wire or electronic communications to increase their profit margins. Defendants specifically used the Tracking Technologies to track and utilize Plaintiffs' and Class Members' activity on the MetLife Portal, including PII and PHI, for financial gain.

239. Defendants were not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

240. Plaintiffs and Class Members did not authorize Defendants to acquire the content of their communications via the Tracking Technologies.

241. Any purported consent that Defendants received from Plaintiffs and Class Members was not valid or sufficient.

242. In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Defendants' MetLife Portal, Defendants' intentionally committed acts that were tortious, criminal, and designed to violate federal and state legal provisions, including as described above the following: (i) violating HIPAA; (ii) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person; and (iii) violation of the statutes and common-law identified herein.

243. Plaintiffs and Class Members seek all relief available under 18 U.S.C. § 2520, including statutory damages and attorneys' fees and costs.

**COUNT IV**

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT,**

**Cal. Penal Code § 631(a)**

**(On Behalf of Plaintiffs & the California Class)**

244. Plaintiffs and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

245. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> …
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over

any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

246. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

247. The Tracking Technologies are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

248. The Tracking Technology Vendors are not parties to the communications. They are "separate legal entit[ies] that offer[ a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Tracking Technology Vendors have the capability to use the wiretapped information for its own purposes. Accordingly, Tracking Technology Vendors are third parties to any communication between Plaintiffs and Class Members, on the one hand, and Defendants, on the other. *Id.* at 521; *see also Javier v. Assurance*

*IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

249. At all relevant times, by their Tracking Technologies, Tracking Technology Vendors willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class Members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

250. At all relevant times, Tracking Technology Vendors used or attempted to use the communications intercepted by their Tracking Technologies to promote and improve their platforms.

251. At all relevant times, Defendants aided, agreed with, employed, permitted, or otherwise enabled Tracking Technology Vendors to unlawfully do, or permit, or cause to be done the acts or things mentioned above in this count.

252. Plaintiffs and Class Members did not provide their prior consent to Tracking Technology Vendors' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class Members' electronic communications. Nor did Plaintiffs and Class Members provide their prior consent to Defendants aiding, agreeing with, employing, permitting, or otherwise enabling Tracking Technology Vendors' conduct.

253. The unlawful eavesdropping complained of in this count occurred in California, where Plaintiffs and Class Members accessed the MetLife Portal and where Tracking Technology Vendors—as enabled by Defendants—were installed on Plaintiffs' and Class Members' devices and thereafter routed Plaintiffs' and Class Members' electronic communications to the third party tracking technology vendors.

254. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendants' violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendants' violations of CIPA § 631(a) and injunctive relief to stop the violations alleged herein.

## COUNT V

## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 632

**(On Behalf of Plaintiffs & the California Class)**

255. Plaintiffs hereby incorporate the factual allegations set forth above by reference.

256. CIPA is codified at Cal. Penal Code §§ 630-638. The Act begins with the following statement of purpose:

> The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

257. Cal. Penal Code § 632 provides, in pertinent part, that it is unlawful for any person "intentionally and without the consent of all parties to a confidential communication," to "use[] [a] recording device to … record the confidential communication."

258. As used in the statute, a "confidential communication" is:

> any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]

259. Plaintiffs' and Class Members' Private Information, which was communicated with Defendants, constitutes confidential communications within the meaning of CIPA.

260. The third-party tracking technology deployed, and the servers to which they sent the intercepted communications, constitute "recording devices" within the meaning of CIPA § 632.

261. There are no "vendor" or "agent" exceptions under Cal. Penal Code § 632.

262. Each Defendant is a "person" within the meaning of CIPA § 632.

263. Defendants intentionally and without the consent of Plaintiffs and Class Members used the third-party tracking technologies to record the confidential communications between Defendants and Plaintiffs and Class Members.

264. Unless enjoined, Defendants will continue to commit the violations of law alleged here. Plaintiff Caton and Class Members need to continue to communicate with Defendants but continue to be at risk of harm from Defendants' conduct.

265. Plaintiffs and Class Members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation or three times the actual amount of damages.

## COUNT VI

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")

## CAL. BUS. & PROF. CODE § 17200 *ET SEQ*.

## (On Behalf of Plaintiffs & the California Class)

266. Plaintiffs and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

267. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By engaging

in the practices aforementioned, Defendants have violated the UCL.

268. Defendants' "unlawful" acts and practices include their violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 631, 632; common law; and the federal statutes identified herein.

269. Defendants' conduct violated the spirit and letter of these laws, which protect privacy interests and prohibit unauthorized disclosure and collection of private, personal data and communications.

270. Defendants' "unfair" acts and practices include their violation of privacy interests protected by the statutes identified above. To establish liability under the unfair prong, Plaintiffs and Class Members need not establish that these statutes were actually violated, although the claims pleaded herein do so.

271. Defendants' conduct constitutes unfair business practices under the UCL because these practices offend established public policy and hurt Plaintiffs and class members, which cannot be reasonably avoided, and that outweighs any benefit to consumers or competition. The conduct also is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

272. Defendants' appropriation of class members' private, personal data and communications was to its economic and commercial advantage. Defendants generate revenue from this unlawful practice through targeted advertising.

273. At no time have Defendants affirmatively sought the necessary consent from class members before appropriating their private, personal data and communications.

274. Plaintiffs and class members received no compensation from Defendants' use of their private, personal data and communications.

275. California's UCL allows anyone to bring an action for injunctive relief if they have "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.

276. Plaintiffs lost money or property because of Defendants' unfair and unlawful practices in violation of the UCL. Defendants took sensitive personal information from Plaintiffs and Class Members without providing compensation. If not for its violation of the law, Defendants would have paid Plaintiffs and Class Members for consent to disclose and/or use their personal information, either in the form of market rates or discounts to the premiums paid for MetLife's insurance products, or ceased such disclosure and/or use.

277. Defendants' actions caused damage to and loss of Plaintiffs' and Class Members' right to control the dissemination and use of their personal information.

278. Plaintiffs' and class members' private, personal data and communications are likely to remain available to Defendants the third-party tracking technology vendors, without Plaintiffs' and class members' consent, and without compensation from Defendants for its appropriation and use. The longer the conduct continues, the more sensitive personal data will be disclosed and compiled into marketing profiles.

279. Plaintiffs seek an order to enjoin Defendants from such unlawful, unfair and fraudulent business acts or practices and to restore to Plaintiffs their interest in money or property that might have been acquired by Defendants through unfair competition.

280. Defendants reaped unjust profits and revenues in violation of the UCL. This includes Defendants' profits and revenues from their targeted advertising. Plaintiffs and the Class seek restitution and disgorgement of these unjust profits and revenues.

**COUNT VII**

**VIOLATION OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION**

**ACT**

**CIVIL CODE SECTION 56 *ET SEQ*. ("CMIA")**

**(On Behalf of Plaintiffs & the California Class)**

281. Plaintiffs re-allege and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

282. MetLife Portal is deemed a provider of health care under Cal. Civ. Code Section 56.06, subdivision (b), because it offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or for the diagnosis, treatment, or management of a medical condition.

283. Plaintiffs and Class members are "Patients" as defined by Cal. Civ. Code Section 56.05(k).

284. The MetLife Portal is designed for users to store personally identifiable information relating to their health and/or for the diagnoses, treatment, or management of users. This information is "Medical Information" as defined by Cal. Civ. Code Section 56.05(j).

285. MetLife Portal is therefore subject to the requirements of the CMIA and obligated under subdivision (d) to maintain the same standards of confidentiality required of a provider of health care with respect to Medical Information that it maintains on behalf of users.

286. MetLife stored in electronic form on its systems Plaintiffs' and Class members' Medical Information as defined in Cal. Civ. Code Section 56.05(j).

287. Plaintiffs and Class members did not provide MetLife Portal authorization, nor was MetLife Portal otherwise authorized to disclose Plaintiffs' and Class members' Medical Information to an authorized third party, such as the Tracking Technology Vendors.

288. In violation of the CMIA, MetLife Portal knowingly and willfully disclosed the

Medical Information of Plaintiffs and Class members without first obtaining "authorization," for its own financial gain.

289. Specifically, MetLife Portal violated Cal. Civil Code Section 56.10, subdivision (a) which prohibits a health care provider from disclosing medical information without first obtaining an "authorization," unless a statutory exception applies. MetLife Portal did not follow any of the proper procedures enumerated in Cal. Civil Code Section 56.11 to obtain proper authorization.

290. The MetLife Portal disclosed medical information without first obtaining authorization when it disclosed to third parties, including the Tracking Technology Vendors, Plaintiffs' and Class members' health data without consent, as described herein. No statutory exception applies.

291. This information was shared with third parties, including the Tracking Technology Vendors, whose business is to sell advertisements based on the data it collects about individuals, including the data Plaintiffs and the Class shared with the MetLife Portal.

292. The installation of Tracking Technologies on the MetLife Portal, and the release of Plaintiffs' and Class members' Medical Information to third parties, including the Tracking Technology Vendors, were affirmative acts in violation of Cal. Civ. Code Section 56.10(a).

293. Cal. Civ. Code Section 56.10(d) reinforces these restrictions by stating that unless "expressly authorized by a patient, enrollee, or subscriber, or as provided by subdivisions (b) or (c), a provider of health care . . . shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient."

294. As a direct and proximate result of MetLife Portal's violation of Cal. Civ. Code Section 56.10(a), Plaintiffs' and Class members' Medical Information was viewed.

295. The MetLife Portal's unauthorized disclosures of Plaintiffs' and Class members'

Medical Information has caused injury to Plaintiffs and Class members.

296. In addition, Cal. Civil Code Section 56.101, subdivision (a), requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

297. Defendants failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because it disclosed to third parties Plaintiffs' and Class members' intimate health data without consent, as described herein.

298. Thus, Defendants shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Cal. Civ. Code Section 56.36.

299. Accordingly, Plaintiffs and Class members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); (4) punitive damages pursuant to Cal. Civ. Code Section 56.35; and (5) reasonable attorneys' fees and other litigation costs reasonably incurred.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully request relief against Defendants as set forth below:

a. Entry of an order certifying the proposed Classes pursuant to the Federal Rules of Civil Procedure;

b. Entry of an order appointing Plaintiffs as representatives of the Classes;

c. Entry of an order appointing Plaintiffs' counsel as Class Counsel for the Classes;

d. Entry of an order for injunctive and declaratory relief as described herein, including but not limited to enjoining Defendants, their affiliates, associates, officers, employees and

agents from transmitting or disclosing Plaintiffs' and Class Members' Private Information to unauthorized third parties;

e. Entry of a judgment in favor of Plaintiffs and each of the other Class Members for damages suffered as a result of Defendants' conduct alleged herein, including compensatory, nominal, statutory, and punitive damages; as well as equitable relief including restitution and disgorgement, to include interest and prejudgment interest;

f. Award Plaintiffs their reasonable attorneys' fees and costs; and

g. Grant such other and further legal and equitable relief as the Court deems just and equitable.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: September 30, 2026

DWOSKIN WASDIN LLP

*s/ Eric Dwoskin*

Eric S. Dwoskin
DWOSKIN WASDIN LLP
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Tel.: (561) 849-8060
edwoskin@dwowas.com

*Attorney for Plaintiffs and the putative Classes*